21-6386
*Lainez v. Bondi*

In the
United States Court of Appeals
for the Second Circuit

───────────────────

August Term 2024
Argued: October 8, 2024
Decided: June 23, 2025

───────────────────

No. 21-6386

───────────────────

ROGER ALBERTO LAINEZ,
*Petitioner,*

v.

PAMELA BONDI, United States Attorney General
*Respondent.*[1]

───────────────────

On Petition for Review of
an Order of the Board of
Immigration Appeals.

───────────────────

Before:  CALABRESI, CABRANES, and PÉREZ, *Circuit Judges.*

This appeal asks us to decide whether Petitioner Roger Alberto Lainez's paternity was "established by legitimation," as that phrase is used in former § 321(a)(3) of the Immigration and Nationality Act ("INA").  To answer this question we must examine the interplay between two bodies of law: first, U.S. immigration law, which at the relevant time included former § 321 of the INA, designed to protect the parental rights of non-citizen parents; and second, El Salvador family law, which was altered by the promulgation of a new constitution

───────────────────

[1] The Clerk of Court is respectfully directed to amend the official caption as set forth above.  Petitioner filed an unopposed motion to amend the caption to reflect his legal name, Roger Alberto Lainez (Dkt. No. 28), which motion was referred to this panel (Dkt. No. 29) and is hereby GRANTED.  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Pamela Bondi is automatically substituted for former Attorney General Merrick B. Garland as the Respondent.

in 1983 that equalized the rights of children regardless of their parents' marital status at birth.  Upon that examination we conclude Lainez's paternity was not "established by legitimation."  As a result, a 2012 order of removal cannot be enforced against him, and the pending removal proceedings must be terminated.

We **GRANT** Lainez's petition for review, **VACATE** the order of removal against him, and **REMAND** to the Board of Immigration Appeals with instructions to **TERMINATE** removal proceedings against him.

Judge Cabranes dissents in a separate opinion.

---

MALIK HAVALIC, (Dustin P. Smith, Vilia B. Hayes, *on the brief*), Hughes Hubbard & Reed LLP, New York, NY, *for Petitioner.*

NANCY K. CANTER, Senior Litigation Counsel, Office of Immigration Litigation (Brian Boynton, Acting Assistant Attorney General, Civil Division; John S. Hogan, Assistant Director, Office of Immigration Litigation; Christina R. Zeidan, Trial Attorney, Civil Division, *on the brief*), U.S. Department of Justice, Washington, DC, *for Respondent.*

---

MYRNA PÉREZ, *Circuit Judge*:

This appeal requires us to decide whether Petitioner Roger Alberto Lainez's

paternity was "established by legitimation," as that phrase is used in former § 321

of the Immigration and Nationality Act ("INA").  Lainez was born in El Salvador

in 1970, and his parents never married.  Lainez and his mother immigrated to the

United States in 1979 as lawful permanent residents, and Lainez's mother became

a naturalized U.S. citizen in 1985. Under our laws, unless Lainez's paternity had been "established by legitimation," he derived U.S. citizenship from his mother's naturalization.

We conclude that Lainez's paternity was not "established by legitimation." El Salvador abolished discriminatory distinctions between children born in and out of wedlock in 1983, before Lainez's mother naturalized, but that change in the law did not establish Lainez's paternity. Therefore, Lainez could and did derive U.S. citizenship from his mother's naturalization without regard to his father's citizenship status. As a result, Lainez cannot be removed from the United States pursuant to a 2012 order of removal, and his removal proceedings must be terminated.

## BACKGROUND

### I.  Relevant Facts

Lainez was born in El Salvador on October 8, 1970. Lainez's father's name appears on his birth certificate, but his parents never married, and his father did not participate in raising him.

In June 1979, Lainez and his mother were admitted as lawful permanent residents to the United States. On February 27, 1985, when Lainez was fourteen years old, his mother became a naturalized U.S. citizen. Lainez's father was never

naturalized.  Lainez ended up in immigration proceedings because, years later, he was convicted of several crimes, including robbery and burglary.

## II.  <u>Procedural History</u>

In 2009, the government placed Lainez in removal proceedings, asserting two grounds of removability:  First, Lainez had been convicted of aggravated felonies; and second, he had been convicted of two crimes involving moral turpitude.  Lainez, appearing pro se, argued that his removal proceedings should be terminated because he is a U.S. citizen, having derived citizenship through his mother's naturalization.  In 2012, the Immigration Judge ("IJ") rejected Lainez's citizenship claim, denied his application for deferral of removal under the Convention Against Torture, and ordered him removed.  Lainez did not appeal.  Around the same time, Lainez also applied for a certificate of citizenship, which was denied.[2]

In 2017, Lainez, appearing pro se, filed a complaint in federal district court, which the court construed as seeking a declaratory judgment that Lainez is a U.S.

---

[2] During his initial removal proceedings, Lainez first argued that he had derived U.S. citizenship while appearing pro se.  For a time, he was represented by a non-attorney representative, but that representative lost his accreditation in 2011 for numerous breaches of professional responsibility.  At Lainez's first court appearance after his representative lost his accreditation, the IJ noted that his former representative "was supposed to submit a brief on the citizenship issue.  He didn't."  Certified Admin. Rec. at 226, 228.  Lainez continued to appear pro se through 2012 when the IJ initially entered an order of removal against him.

citizen. *See Lainez v. Osuna*, No. 17 Civ. 2278, 2018 WL 1274896, at *2 (S.D.N.Y. Mar. 8, 2018). The district court dismissed the complaint for lack of subject matter jurisdiction. *Id.* at *4–6. Lainez appealed, represented by the same counsel that now represents him in this appeal. This Court affirmed the district court's dismissal of his complaint but recognized that Lainez had a "nonfrivolous citizenship claim" that raised complex legal and factual issues. *Lainez v. McHenry*, 809 F. App'x 40, 41–42 (2d Cir. 2020) (summary order). We stated that Lainez could press his citizenship claim by seeking to reopen his immigration case, and the government agreed not to remove or detain him pending those proceedings. *Id.*

On July 16, 2020, Lainez, through counsel, filed a motion with the IJ seeking reconsideration or reopening of the proceedings that had ended with his 2012 removal order. The IJ denied Lainez's motion, and he appealed. The Board of Immigration Appeals ("BIA") dismissed Lainez's appeal on June 7, 2021. This petition for review followed.

## STANDARD OF REVIEW

We review the IJ and BIA decisions together, because the BIA briefly affirmed the IJ's decision and adopted the reasoning of the IJ decision in doing so. *Wangchuck v. Dep't of Homeland Sec.*, 448 F.3d 524, 528 (2d Cir. 2006) (citation

omitted). Because Lainez has been ordered removed based on convictions for an "aggravated felony" and multiple "crimes involving moral turpitude," our jurisdiction is limited only to the review of constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(C), (D); *see* 8 U.S.C. § 1227(a)(2)(A)(i)–(iii). The scope of our review includes mixed questions of law and fact, such as "[t]he application of a statutory legal standard . . . to an established set of facts." *Wilkinson v. Garland*, 601 U.S. 209, 212, 218–19 (2024).

We have jurisdiction to review Lainez's claim that he is a U.S. citizen because "[a]n assertion of U.S. citizenship is . . . a denial of an essential jurisdictional fact in a deportation proceeding." *Duarte-Ceri v. Holder*, 630 F.3d 83, 87 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)); *see Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005) ("If [petitioner] is a United States citizen, then § 1252(a)(2)(C) cannot bar his petition."). "We review the question of derivative citizenship *de novo* where, as here, 'the petitioner claims to be a national of the United States' and the record presents 'no genuine issue of material fact about the petitioner's nationality.'" *Gil v. Sessions*, 851 F.3d 184, 186 (2d Cir. 2017) (quoting *Morales-Santana v. Lynch*, 804 F.3d 520, 525

6

(2d Cir. 2015), *rev'd in part on other grounds sub nom., Sessions v. Morales-Santana,* 582 U.S. 47 (2017)); *see* 8 U.S.C. § 1252(b)(5)(A).

## APPLICABLE LAW

Lainez's claim of U.S. citizenship is that he derived citizenship through his mother, when she became a naturalized citizen before Lainez turned 18 and while he was living in her custody in the United States as a lawful permanent resident. Our evaluation of his claim depends on both U.S. immigration law and El Salvador family law.

### A. The Immigration and Nationality Act

Former § 321 of the INA, which was in effect at all times relevant to Lainez's appeal, provided as follows:

(a) A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of the parents is deceased; or

(3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

7

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a).[3] Lainez relies on the portion of subparagraph (3) that permits a child to derive citizenship from his mother's naturalization without regard to his father's citizenship, if the child was "born out of wedlock" and his paternity was never "established by legitimation." 8 U.S.C. § 1432(a)(3).

A related provision of the INA, § 101, which was in effect at the relevant time and remains in effect in substantially similar form, defines the term "child" for purposes of the INA. 8 U.S.C. § 1101. The definition used for purposes of, e.g., visa preference, defines child to include "a child legitimated under" the relevant sovereign's laws before the child turns 18. § 1101(b)(1)(C). And the definition

---

[3] Former § 321 was repealed by the Child Citizenship Act of 2000, Pub. L. No. 106-395, § 103, 114 Stat. 1631, 1632 (2000). In its place, § 320 as amended provides that any "child born outside of the United States automatically becomes a citizen of the United States" when at least one parent is a citizen, the child is under 18 years old, and the child resides in the United States in the custody of the citizen parent as a lawful permanent resident. *Id.*; *see* 8 U.S.C. § 1431. However, we apply former § 321 because it was the law "in effect when [Lainez] contends that he fulfilled the last requirement for derivative citizenship." *Dale v. Barr*, 967 F.3d 133, 136 (2d Cir. 2020) (internal quotation marks omitted) (quoting *Poole v. Mukasey*, 522 F.3d 259, 264 (2d Cir. 2008)).

used for purposes of derivation of citizenship, including former § 321, "includes a child legitimated under" the relevant law before the child turns 16.  § 1101(c)(1).

### B.  El Salvador Family Law

In 1983, El Salvador adopted a new constitution, article 36 of which provides, as translated to English:

> The children born in or out of matrimony and the adopted [ones], have equal rights before their parents.  [It] is the obligation of these to give their children protection, assistance, education and security.
>
> Any description [*calficación*] concerning the nature of the affiliation will not be consigned in the records of the Civil Registry, nor will the civil status of the parents be expressed in the birth certificates [*partidas*].
>
> Every person has the right to have a name to be identified [with].  The secondary law [*ley secondaria*] will regulate this matter.
>
> The law will determine likewise the forms of investigating and establishing the paternity.

Constitution of El Salvador, Dec. 20, 1983, art. 36 (Jefri Jay Ruchti, ed., Maria del Carmen Gress et al., trans., HeinOnline World Constitutions Illustrated 2018) [hereinafter El Salvador Const.] (brackets in original).[4]

---

[4] The record before the BIA did not contain a translated copy of El Salvador's 1983 constitution itself, but rather a report from the Law Library of Congress on El Salvador Paternity Law, which quotes the relevant portions of article 36 as follows:

Prior to the adoption of the 1983 constitution, El Salvador's Civil Code drew several distinctions between "legitimate," "illegitimate," and "natural" children. The category of "natural" children included those, like Lainez, who were born out of wedlock but were acknowledged by their fathers on their birth certificates.  At that time, a child born out of wedlock could be legitimated by the subsequent marriage of the parents and thus receive rights equal to those of a child born in wedlock.

Those "secondary laws" remained on the books after 1983, through Lainez's mother's naturalization in 1985 and Lainez's 18th birthday in 1988, until they were repealed by El Salvador's 1993 Family Code.  The parties dispute, however, whether those secondary laws were implicitly repealed by operation of the 1983 constitution.  A 2008 report prepared by the Law Library of Congress, and relied upon by the government in Lainez's case, stated:  "Based on the principle of

---

Article 36. Children born in or out-of-wedlock and adopted children have equality of rights in regard to their parents.  It is the parents' obligation to provide their children with protection, assistance, education, and security.

No mention shall be entered in the records of the Civil Registry of qualifications on the nature of filiation, and birth certificates shall not mention the marital status of the parents.

. . .

The law shall, likewise, prescribe the manners of investigating and establishing paternity.

Certified Admin. Rec. at 517 (ellipsis in original).

10

supremacy of the Constitution, article 36 of the Constitution invalidated the existing provisions of the Civil Code . . . which classified children according to the nature of their filiation and granted them unequal rights." Certified Admin. Rec. at 517. Among the laws that may have been invalidated are those placing natural children "in a disadvantageous order of [intestate] succession from their father with respect to legitimate children." *Id.*

The same Law Library of Congress report also addressed the subsequent enactment of new secondary laws to comport with the 1983 constitution, stating:

> The Family Code of 1993, being in harmony with the Constitution, granted equal rights to all children regardless of their filiation, and none of these rights can be renounced. Under the Code, when children are born within a union not bound by marriage, they need to have their filiation established in order to have their rights implemented. Once paternity has been established, the effects thereof concerning parental authority, inheritance, and any other rights are completely equal, regardless of whether a child was born in or out of wedlock. Moreover, the Family Code explicitly repealed many provisions and titles of the Civil Code related to domestic relations . . . .

*Id.* at 518.

With that background in mind, we turn to the question at hand.

11

## DISCUSSION

We must decide whether Lainez's "paternity" was "established by legitimation," as that phrase is used in former § 321, by El Salvador's promulgation of a new constitution in 1983 granting all children equal rights before their parents. To answer that question, we first determine what it means for "paternity" to be "established by legitimation" in former § 321. Then, we apply that interpretation to Lainez's case. We conclude that paternity is established by legitimation when a father's parental rights with respect to his child are established in connection with an act of legitimation. We then conclude that El Salvador's constitutional reform granting children equal rights and prohibiting discrimination did not establish Lainez's father's parental rights, and so did not establish Lainez's paternity by legitimation. Therefore, Lainez was free to derive citizenship from his mother's naturalization and is not removable.

### I.    Establishment of Paternity for Purposes of Former § 321

Our first conclusion is that "paternity" is "established by legitimation," as that phrase is used in former § 321, when it is established that a specific person (other than the child's mother) has parental rights with respect to the child in connection with an act of legitimation. This interpretation follows from two premises. First, paternity is not established automatically by the enactment of a

12

general legitimation law.  Second, former § 321's protections for the rights of non-citizen parents depend, naturally, on the establishment that a particular person has parental rights with respect to the child.  We elaborate on each below.

### A. Establishment of Paternity Versus Legitimation

A long line of precedent from this Court and the BIA hold that a general statute conferring equal rights on all children regardless of parents' marital status "legitimates" those children, but such a law does not necessarily "establish" their "paternity" "by legitimation" as those terms are used in former § 321.  Even if we wrote on a blank slate, the text of the INA would compel the same conclusion.

Starting with precedent, it is well established that a country or a U.S. state may "legitimate" all children in its jurisdiction through a general law conferring equal rights.  We and the BIA have interpreted "legitimated," for purposes of § 101 of the INA, to refer to when "a child born out of wedlock . . . has been accorded legal rights that are identical to those enjoyed by a child born in wedlock."  *Gil*, 851 F.3d at 187 (quoting *De Los Santos v. I.N.S.*, 690 F.2d 56, 58 (2d Cir. 1982)) (noting this has long been the BIA's interpretation).  But we and the BIA have also recognized that a child being "legitimated" does not always mean the child's paternity has been "established by legitimation."  8 U.S.C. § 1432(a)(3).  Almost

13

fifty years ago, in *Lau v. Kiley*, we discussed statutes from Arizona and Oregon as "making all children the legitimate children of their natural parents, thus basing 'legitimacy' solely on the biological relationship of parents and child." 563 F.2d 543, 549 (2d Cir. 1977). We noted that another state statute "list[ed] methods by which the paternity of a person may be established," even though the legitimation statute contained "no requirement that the child's paternity be established." *Id.* at 550. But, we noted, that was not "in any way surprising, for a paternity proceeding is intended to establish the identity of the father, while legitimation which pursuant to this statute is universal establishes the legal status of the child." *Id.*

More recently, in *In re Moraga*, a case relied upon heavily by the government, IJ, and BIA in Lainez's case, the BIA addressed El Salvador's 1983 constitution, recognizing that it "legitimated" all Salvadoran children of a certain age. 23 I. & N. Dec. 195, 199 n.6 (B.I.A. 2001). But the BIA also recognized that "[t]o establish a child's paternity, if he or she is born out of wedlock, the acknowledgment of the child according to the legal procedures established by the Family Code may be required." *Id.* In 2015, the BIA reaffirmed this distinction between "legitimation as a stand-alone concept" under § 101, and "as a mechanism for establishing paternity as in former section 321(a)(3)." *In re Cross*, 26 I. & N. Dec. 485, 492 (B.I.A.

14

2015).  And we deferred to the BIA's interpretation in a recent summary order.  *See United States v. Lewis*, 774 F. App'x 8, 11 (2d Cir. 2019) (summary order).

Turning to the text of the statute itself, we no longer defer to the BIA's interpretation, as we did in *Lewis*, but we reach a similar conclusion as to the "single, best meaning" of the statute.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).  When Congress enacted the INA in 1952, it knew how to write provisions like § 101 such that certain immigration consequences follow from a child merely being "legitimated."  *See* 8 U.S.C. § 1101(b)(1)(C), (c)(1).  But Congress wrote former § 321 to require something more, i.e., that "paternity" is "established by legitimation."  *See* § 1432(a)(3).  "As a general matter, the use of different words within the same statutory context strongly suggests that different meanings were intended."  *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999).  Therefore, more than a general legitimation law must be required for "paternity" to be "established by legitimation."  We turn next to the question of what else, exactly, is necessary.

### B.  Establishment of Paternity as Establishment of Parental Rights

The difference between establishment of paternity for purposes of former § 321, on the one hand, and mere legitimation, on the other, is that establishing paternity means establishing who has parental rights with respect to a given child.

This definition of "establishment of paternity" focuses on the rights of a parent with respect to his child, and not the rights of a child with respect to his parents, because parental rights were the focus of former § 321. The statute allowed a father effectively to block his children from deriving U.S. citizenship, in order to protect the rights of non-citizen fathers. *See Lewis v. Gonzales*, 481 F.3d 125, 131 (2d Cir. 2007) ("The statute recognizes that either parent . . . may have reasons to oppose the naturalization of their child, and it respects each parent's rights in this regard."); *Brissett v. Ashcroft*, 363 F.3d 130, 134 (2d Cir. 2004) (noting that former § 321(a)(3) "prevent[ed] the naturalizing parent from usurping the rights of the alien parent"); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1066 (9th Cir. 2003) ("If United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished."), *overruled on other grounds as recognized in*, *United States v. Mayea-Pulido*, 946 F.3d 1055 (9th Cir. 2020).

It follows that whether paternity is established for purposes of former § 321 depends on whether a father has parental rights with respect to a child. *See, e.g.*, *Colin-Villavicencio v. Garland*, 108 F.4th 1103, 1113–14 (9th Cir. 2024) (holding petitioner was ineligible to derive citizenship under former § 321 because her

father acknowledged paternity, and, when she "was born in 1983, under Baja California's civil code," all children had equal rights regardless of their parents' marital status, and "a parent could establish parental rights by voluntarily acknowledging the child on the birth record"). It would make no sense to give a father veto power over his child's citizenship to protect non-existent rights. As we concluded when we upheld former § 321 against an equal protection challenge to its gender-based distinction between mothers and fathers, former § 321 "reflected the practical reality that the interests of the alien father merited protection only where that father had legitimated the child and thereby demonstrated a connection to the child." *Pierre v. Holder*, 738 F.3d 39, 57 (2d Cir. 2013). In other words, in cases where "the custodial mother naturalizes and the father has not bothered to legitimate his child," the father "has been removed, or removed himself, from the child's life to some significant degree, such that their parental rights receive less respect." *Lewis*, 481 F.3d at 131.

We turn next to analyze whether El Salvador's 1983 constitution established Lainez's paternity by legitimation, based on the principles described above.

## II.    Application to El Salvador's 1983 Constitution

El Salvador's promulgation of a new constitution in 1983, placing children on equal footing regardless of the marital status of their parents at birth, did not

17

establish Lainez's paternity by legitimation. As we explain below, the simple reason is that the 1983 constitution did not establish his father's parental rights.[5]

First, the text of El Salvador's 1983 constitution makes clear that it addresses the rights of children—not parents—and the duties of parents—not children. *See* El Salvador Const. art. 36 ("The children born in or out of matrimony and the adopted [ones], have equal rights before their parents. [It] is the obligation of these to give their children protection, assistance, education and security."). It thus granted Lainez equal rights before his parents, which presumably lessened Lainez's burden to seek support or inheritance from his father, for example. But the constitution was silent about the rights of his parents, and in fact it expressly preserved the role of the secondary law of El Salvador in defining "the forms of . . . establishing the paternity." *Id.* As a result, El Salvador's 1983 constitution did not create any "interests of the alien father [that] merit[] protection" that did not already exist, *Pierre*, 738 F.3d at 57, and the constitution did not, of its own force, establish Lainez's paternity by legitimation.[6]

---

[5] Because we conclude that Lainez's father never obtained protectable parental rights, we need not reach Lainez's alternative argument that paternity is not "established by legitimation" if, after paternity is established, a father then abandons his child.

[6] We need not decide whether we agree with the Ninth Circuit's decision, in *Anderson v. Holder*, that a particular child's paternity was "established . . . by legitimation" for the purpose of former § 309 of the

Second, while not necessarily dispositive of this appeal, El Salvador did not leave unwed fathers without recourse to establish paternity over their children "by legitimation." Section 214 of El Salvador's Civil Code, in effect in 1983 and for a decade thereafter, stated: "Children conceived out of wedlock and legitimated through a subsequent marriage between their parents are also legitimate children."[7] Certified Admin. Rec. at 109. Even if, as the government argues, El Salvador's 1983 constitution implicitly repealed provisions of the Civil Code that were inconsistent with equality of children's rights—such as discriminatory orders of inheritance—we are not convinced the 1983 constitution invalidated section 214. Retaining a procedure (including marriage) for establishing parental rights is not inconsistent with equalizing children's rights. For example, there

---

INA, 8 U.S.C. § 1409, which allowed a child to acquire U.S. citizenship from a citizen parent if their paternity had been so established. 673 F.3d 1089 (9th Cir. 2012). The Ninth Circuit held that the petitioner's paternity was established by legitimation by a state's equalization of children's rights, where as a practical matter the identity of the petitioner's father was known and undisputed, even though the state's "law contains other provisions that specifically govern the question of paternity." *Id.* at 1103. In *Anderson*, there was "no question" about the identity of Anderson's father, and the highest court of the state had held in an unrelated case that the child had "the right of inheritance as though born in wedlock" whether or not he went through the formal process to establish paternity. 673 F.3d at 1092, 1104 (quoting *In re Cook's Est.*, 159 P.2d 797, 801 (1945)). Given that former § 309 allowed a child born outside the United States to *benefit* from a citizen parent's status—unlike former § 321 that allowed a non-citizen parent to *block* their child from deriving citizenship—the proper focus of former § 309 may well be on the rights of children, e.g., rights to receive benefits like support and inheritance. We also need not decide whether a general statute equalizing the rights of *parents* could establish paternity by legitimation, at least as to certain children.

[7] While the government argues that section 214 of El Salvador's Civil Code is irrelevant because the 1983 constitution automatically established Lainez's paternity by legitimation, the government does not dispute Lainez's argument that marriage was the *only* way to establish paternity by legitimation provided by El Salvador's secondary law, until 1993.

19

would be no inconsistency if, under El Salvador's post-1983 law, Lainez had the right to claim benefits from his father, even if he had not been legitimated and his father did not have reciprocal custodial or parental rights.

Therefore, we need not decide whether the result would be the same in a country that had no mechanism whatsoever for the establishment of paternity by legitimation. The same principles would apply, but the lack of any pathway for an unwed father to establish parental rights might bear on our interpretation of a country's laws on legitimation. Or, we might simply find there was a gap in the statute. In other words, it is entirely possible that Congress wrote a law in 1952 that assumed a world in which "illegitimate" children had to be "legitimated," and as the world moved away from those distinctions, our law was a little slow to catch up, until Congress eventually updated the relevant provisions in 2000.

Finally, Lainez's father did not take any relevant actions to establish his paternity by legitimation under El Salvador law. It is undisputed that Lainez's parents did not marry before or after his birth. At oral argument, the government conceded that his father's name appearing on his birth certificate does not actually matter in this case, and we agree. Even if the government were correct that El Salvador's 1983 constitution repealed existing "legitimation" procedures such as

section 214 of the Civil Code, there is no reason to think the constitution somehow implicitly created new procedures for establishing paternity. The 1983 constitution itself, and the Law Library of Congress report quoted above, both recognize the primacy of the secondary law in the establishment of paternity. *See* El Salvador Const. art. 36 ("The [secondary] law will determine likewise the forms of investigating and establishing the paternity."). While there is no dispute about who Lainez's father is, that does not mean he obtained parental rights. Because that is the relevant inquiry under former § 321, we conclude Lainez could and did derive citizenship from his mother's naturalization.

## CONCLUSION

For the foregoing reasons, we **GRANT** Lainez's petition for review, **VACATE** the order of removal against him, and **REMAND** to the BIA with instructions to **TERMINATE** removal proceedings against him.

21